Argued and submitted April 11, affirmed May 10, 2000

THE AMERICAN HARDWARE INSURANCE GROUP,
*Respondent,*

*v.*

WEST ONE AUTOMOTIVE GROUP, INC.,
an Oregon corporation,
*Appellant.*

WEST ONE AUTOMOTIVE GROUP, INC.,
an Oregon corporation,
*Counterclaim - Plaintiff,*

*v.*

THE AMERICAN HARDWARE INSURANCE GROUP,
*Counterclaim - Defendant.*

(9802100CV; CA A106057)

2 P3d 413

Thomas F. Ahearne, Seattle, Washington, argued the cause for appellant. With him on the briefs was Foster Pepper & Shefelman LLC.

Timothy Gerking argued the cause for respondent. With him on the brief were Mark R. Weaver, Brophy Mills, Schmore and Gerking & Brophy, LLP.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

**BREWER, J.**

In this action for a declaratory judgment, defendant West One Automotive Group appeals from summary judgment in favor of plaintiff American Hardware Insurance Group. Defendant argues that the trial court erred when it concluded that two insurance policies issued by plaintiff did not require plaintiff to defend and indemnify defendant against a wrongful termination claim under a provision that covered liability for personal injuries arising out of "eviction." We review for errors of law, *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992), and affirm.

Defendant purchased four commercial insurance policies from plaintiff, two of which are at issue in this case. Those policies each provided personal injury liability coverage for claims based on defendant's "wrongful entry into, or eviction of a person from, a room, dwelling or premises that the person occupies." In 1996, John Ingolia filed an action alleging that defendant had wrongfully discharged him from employment. Defendant tendered the defense of the action to plaintiff, contending that Ingolia's claim was for "eviction," and was, thus, covered under the policies. Plaintiff rejected the tender. In 1998, defendant settled Ingolia's claim and requested indemnification from plaintiff, which plaintiff refused.

Plaintiff then commenced this action, seeking a declaration that none of the policies covered Ingolia's wrongful termination claim and that plaintiff, therefore, had no duty to defend or indemnify defendant. Defendant counterclaimed for a declaration that plaintiff breached its duties to defend and indemnify defendant under the policies and also alleged separate counterclaims based on several theories, including estoppel, misrepresentation, and bad faith. The parties filed cross-motions for summary judgment. The trial court granted summary judgment in favor of plaintiff on its declaratory judgment claim, and denied summary judgment on all other claims and counterclaims. The court concluded that "[t]he wrongful termination claim against West One in the *Ingolia* litigation is not covered by the insurance American Hardware sold to West One."

Defendant assigns error to the trial court's grant of summary judgment in favor of plaintiff. The issue on appeal is whether Ingolia's wrongful termination claim is one for wrongful eviction under the personal injury coverages of the policies. Defendant asserts that the policies must be construed liberally to favor coverage, to "promote the polic[ies'] purpose," and so as not to render their provisions superfluous. Plaintiff responds that the term "wrongful eviction," as used in the policies, applies only in cases involving a possessory interest in particular premises, and does not include Ingolia's wrongful termination claim. Therefore, plaintiff argues, it had no duty to defend the Ingolia claim or to indemnify defendant from the cost of its settlement.

■■ "Whether an insurer has a duty to defend an action against its insured depends on two documents: the complaint [against the insured] and the insurance policy." *Ledford v. Gutoski*, 319 Or 397, 399, 877 P2d 80 (1994). If the complaint alleges facts which, if proved, would impose liability covered by the policy, the insurer must defend. *Id.* at 399-400. Because defendant settled Ingolia's claims, the duty to indemnify is determined by the same principles. *Northwest Pump v. American States Insurance Co.*, 144 Or App 222, 230, 925 P2d 1241 (1996). We begin our analysis by summarizing the claims Ingolia made against defendant. *See Winther v. Valley Ins. Co.*, 140 Or App 459, 461, 915 P2d 1050 (1996) (following the same order of analysis).

Ingolia filed his action against defendant in the United States District Court for the District of Oregon. His complaint sought damages for wrongful discharge from employment and, in addition, unpaid wages and related penalties. In general, the complaint alleged that defendant was engaged in various deceptive business practices, that Ingolia opposed those practices, and that he was fired as a result of his objections. He alleged that his discharge violated public policies embodied in various federal and Oregon statutes, including the Oregon Unlawful Trade Practices Act, ORS 646.605 to ORS 646.656. Ingolia did not allege that he had been evicted or dispossessed of any right to remain on West One's premises. The complaint sought damages for back pay, future wages, and other economic and noneconomic damages resulting from the "wrongful discharge." Ingolia also sought

punitive damages to "deter similar wrongdoing." With the substance of Ingolia's claim in mind, we examine the policies plaintiff issued.

■ In *Hoffman Construction*, the Supreme Court described the appropriate methodology for interpreting the terms of an insurance policy. 313 Or at 469-71. The first step inquires whether the policy defines the term at issue. If the term at issue is not defined in the policy, we proceed to the second step, which requires us to examine the plain meaning of the term. Unless the term is ambiguous, that is, susceptible to more than one plausible interpretation, its plain and ordinary meaning controls our interpretation of the policies. If there is more than one plausible interpretation of the term's plain meaning, each interpretation must be scrutinized in light of the specific context in which the term is used in the policy and also in the broad context of the policy as a whole. Finally, if both interpretations remain reasonable, the rule of interpretation against the drafter applies. *Id.*

The policies in this case did not define the term "eviction." Therefore, we examine the plain meaning of the term. The ordinary meaning of eviction includes

> "1: the act or process of evicting or the state of being evicted[.] 2 a: the recovery of lands or tenements from another's possession by due course of law * * * [.] b: dispossession in virtue of a paramount title[.] c: dispossession of a tenant by his landlord * * *[.]" *Webster's Third New Int'l Dictionary*, 788 (unabridged ed 1993).

"Evict" means

> "1 a: to recover (property) of or from a person by legal process or by virtue of a superior title[.] b: to put out (a person) from property by legal process or by virtue of a paramount right or claim of such right: eject, oust[.] 2: to force out: expel * * *[.]" *Id.*

Black's Law Dictionary defines "eviction" as

> "Dispossession by process of law; the act of depriving a person of the possession of land or rental property which he has held or leased. Act of turning a tenant out of possession, either by re-entry or legal proceedings, such as an action of

ejectment. Deprivation of lessee of possession of premises or disturbance of lessee in beneficial enjoyment so as to cause tenant to abandon the premises (the latter being constructive [e]viction)." *Black's Law Dictionary*, 555 (6th ed 1990) (citation omitted).

The primary definition of "evict," by referring to the actor as one asserting a "superior title," suggests a requirement that the person evicted must have a possessory interest in the premises he or she occupied. However, a secondary meaning of "evict," to expel, is not explicitly tied to deprivation of a *possessory* interest in property. Defendant argues that Ingolia was evicted because he was "forced * * * out and expelled * * * from the West One workplace."

Our analysis of the parties' arguments is guided by the Supreme Court's decision in *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or 303, 985 P2d 1284 (1999). In *Groshong*, the insured, a landlord, was sued by a prospective tenant who claimed that the landlord had wrongfully refused to rent an apartment to her because she had a young child. *Id.* at 306. The landlord tendered the defense of the claim to his liability insurer, contending that the tenant's claim fell within policy coverage for injuries arising out of wrongful entry or eviction, or other invasion of the right of private occupancy. Following the *Hoffman* framework, the Supreme Court rejected the insured's argument. The court acknowledged that the ordinary meaning of the phrase, "other invasion of the right of private occupancy" could, as the insured argued, be meant to refer to future possessory interests. However, the court construed the phrase in context as tied to "the wording that precedes it by the word 'other.' " *Id.* at 312. That preceding language: "entry or eviction," was most telling to the court. The court stated:

> "Again, standing alone, it is not entirely clear that the phrase 'other invasion of the right of private occupancy' embraces only claims that involve possessory interests. *It is clear, however, that claims for 'wrongful entry or eviction' are so limited. Stated differently, a person cannot suffer a wrongful entry or eviction until that person actually occupies — or at least has a cognizable possessory interest in — a particular premises." Id.* at 313 (emphasis added).

Because the prospective tenant did not allege the loss of actual occupancy or a possessory interest in property, she was not wrongfully evicted and the claim was not covered. *Id.* at 313-14.

Defendant acknowledges that Ingolia did not have a possessory interest in his workplace. However, defendant argues that, unlike the prospective tenant in *Groshong*, Ingolia "actually occupied" defendant's premises by virtue of his employment status. Although the primary meaning of the term "occupy" is to "take possession," a secondary meaning of the term is to "use." *Webster's* at 1561. Therefore, defendant reasons, Ingolia need not have had a possessory interest in the premises at which he carried out his employment duties in order to actually occupy them. In defendant's view, the policies contemplate that a person may be "evicted" from premises in which he or she has no possessory or other independent legal right to remain, and may "occupy" such premises by merely using them. Although defendant's interpretation of the terms "evict" and "occupy" is strained and less persuasive than their primary meanings, that interpretation is not wholly implausible. Therefore, as did the court in *Groshong*, we move to the third stage of the *Hoffman* methodology and examine the "particular context in which [the provision] is used in the policy and the broader context of the policy as a whole." *Hoffman*, 313 Or at 470.

The fundamental problem with defendant's theory is that it makes little sense in the context of the provision in which the terms "evict" and "occupies" are used. That provision extends personal injury liability coverage for the "wrongful entry into, or eviction of a person from a room, dwelling or premises that the person occupies." Even though at least one possible secondary meaning of each term does not necessarily require an antecedent right of possession on the part of the person removed, in the context of a provision covering *personal injury*, the predominant meanings of "evict" and "occupies" overwhelm any other possible meaning. The form of personal injury described in the policies clearly flows from the *actionable consequence* of a wrongful act.[1] In contrast,

---

[1] Other offenses covered by the provision include false arrest, malicious prosecution, libel, and invasion of privacy.

any "eviction" Ingolia suffered was a *symptom* of the termination. Ingolia did not sue defendant because he was not allowed to work in a particular place; he sued because he was not allowed to work for defendant at all. The specific context of the terms so obviously refers to a claim for the ejection of a person who asserts a possessory or other legal right to occupy particular premises that any suggestion to the contrary is implausible.

Defendant's argument is also implausible when viewed in the context of the policies as a whole. Identical provisions in both of the policies excluded from coverage claims for bodily injury to "a person arising out of any * * * [t]ermination of that person's employment[.]" As defendant points out, that exclusion applies only to *bodily* injury and, therefore, does not directly defeat coverage for any *personal* injury claim made by Ingolia. However, the exclusion is significant for another reason: it demonstrates that the parties recognized a distinction between claims for eviction and claims for wrongful termination from employment. There is no reason to believe that the parties would use the term "eviction" to refer to termination from employment, when they have made it perfectly clear in a different context in the same policies that termination of employment is a concept with an independent meaning. ORS 42.230 (construe contracts so as to "give effect to all" provisions); *Standley v. Standley*, 90 Or App 552, 556, 752 P2d 1284, *rev den* 306 Or 413, (1988) (agreement should be interpreted to give meaning to all of its terms).

Defendant relies on an Arkansas decision in which the court held that a policy provision substantially identical to those involved in this case triggered an insurer's duty to defend a country club against a civil rights action filed by a high school student who was barred from using its facilities because of her race. *INA v. Forrest City Country Club*, 36 Ark App 124, 819 SW2d 296 (1991). The court held that coverage for wrongful eviction applied to the removal of a licensee from the insured's premises. *Id.* at 128. That case is distinguishable because it, unlike this case, *did* involve a person's right to remain on property; it did not involve a claim for wrongful termination of employment. The Arkansas court simply had no occasion to consider the issue at stake in this case. We also

note that the Arkansas court did not use a methodology similar to ours in construing the term at issue. Rather than examining the plausible meaning of the term in the context in which it was used and in the broader context of the policy as a whole, as the Oregon courts do, *Hoffman*, 313 Or at 470, the Arkansas court simply concluded that the term "eviction" is ambiguous and applied a rule of construction in favor of the insured. *INA*, 36 Ark App at 127. Because *Forrest City Country Club* omitted a critical step of analysis under Oregon's methodology, we would not adopt its reasoning even if it were otherwise in point.

■■ We conclude that the meaning of the term "eviction," as used in the policies, is clear in light of the context of its use and the broader context of the policies as a whole; it refers to a claim based on the removal of a person who asserts a right to occupy particular premises. It does not apply to a claim for wrongful termination from employment. Therefore, the trial court did not err in granting summary judgment in favor of plaintiff on its declaratory judgment claim.

Affirmed.